**Bonita S. DUNBAR, Appellant,**

v.

**BAYLOR COLLEGE OF MEDICINE, BCM Technologies, Inc., Zonagen, Inc., Fulbright & Jaworski, and The Woodlands Venture Capital Company, Appellees.**

**No. 01–96–00958–CV**

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 23, 1998.

---

30. Majority op. at 330.

31. *Grimes,* 707 S.W.2d at 203.

Elizabeth Sturdivant Kerr, Fort Worth, Douglas Mark Selwyn, Houston, for Appellant.

Marie R. Yeates, Houston, Ralph K. Harrison, Woodlands, Mark K. Glasser, for Appellees.

Before Justices O'CONNOR, WILSON, and TAFT.

## OPINION

TIM TAFT, Justice.

Bonita S. Dunbar sued Baylor College of Medicine (BCM), BCM Technologies, Inc. (BCMT), Zonagen, Inc. (Zonagen), Fulbright & Jaworski (Fulbright), and The Woodlands Venture Capital Company (Woodlands) (collectively, appellees), alleging breach of fiduciary duty, fraud, legal malpractice, DTPA violations, and conspiracy.[1] The trial judge granted summary judgment for appellees on statute of limitation grounds. Dunbar appeals. We reverse and remand.

### Facts

Dunbar is a cellular and molecular biologist, and has been employed by BCM since 1981. The basis of her lawsuit, filed on May 10, 1994, was a series of 1987 transactions that began with an assignment of her rights, in certain immunocontraceptive technology (invention) she discovered, to BCM. BCM assigned the rights to the invention to BCMT, who assigned the rights to Zonagen. Woodlands provided the financial backing for the formation of Zonagen.

On October 7, 1987, Dunbar signed an agreement (First Agreement) assigning all rights in the invention to BCM pursuant to the terms of the BCM 1987 Patent Policy.[2] She signed this agreement because she was

---

1. Dunbar also sued Zonagen for conspiracy, but that claim has been severed.

2. The First Agreement stated that Dunbar would "hereby sell, assign, and convey unto [BCM], all right, title and interest throughout the world in and to [the invention]...."

told by a Fulbright attorney (Dr. Roseanne Goodman) representing BCM that it was a requirement of the terms of her employment with BCM.[3] BCM's 1987 Patent Policy stated that, in return for all rights to the invention, Dunbar would receive either royalty payments, or, if BCM entered into an agreement with a third-party corporation to develop the invention, Dunbar would receive stock in the corporation in exchange for the release of her royalty payments. Accordingly, on December 31, 1987, Dunbar, BCM, BCMT, and Zonagen signed an agreement ("Second Agreement") assigning BCM's and Dunbar's rights in the invention to Zonagen.[4]

On December 30, 1987, Dunbar also executed a consulting agreement with Zonagen ("Consulting Agreement").[5] The Consulting Agreement acknowledged the assignment of the invention from Dunbar to Zonagen.[6] It required Dunbar to deliver to Zonagen copies of all data, information, and reports made pursuant to the agreement. It also provided that "Any inventions, improvements, technology, product, process, method, technique, machine, device or service made or conceived by [Dunbar] in connection with and during performance of services hereunder ... shall be the sole property of Zonagen...."

On December 31, 1991, Zonagen ended its consulting relationship with Dunbar. In January 1993, Zonagen demanded access to Dunbar's lab notebooks pursuant to the terms of the Consulting Agreement. Two days later, Dunbar learned BCM and BCMT agreed to Zonagen's demands. Dunbar's affidavit states that this was the first time she realized Zonagen was asserting greater

rights than to which she thought it was entitled.

In May 1994, more than six years after the agreements were signed, Dunbar sued for breach of fiduciary duty, fraud, legal malpractice, DTPA violations, and conspiracy.

Appellees filed motions for summary judgment[7] asserting Dunbar's claims were time-barred because she had actual knowledge of the facts giving rise to her causes of action when she signed the agreements. The trial judge granted the motions for summary judgment.

### Limitations

In one point of error, Dunbar asserts summary judgment was erroneous because her claims were not time-barred.[8] We follow the usual standard of review. TEX.R. CIV. P. 166a(c); *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995).

### A. Causes of Action

Dunbar's fourth amended petition alleged a breach of fiduciary duty, fraud, legal malpractice, DTPA violations, and conspiracy against all appellees. Appellees' motions for summary judgment did not attempt to disprove any of these causes of action; they asserted only that Dunbar's claims were time-barred because she knew the facts giving rise to her causes of action.

### B. Discovery Rule/Fraudulent Concealment

In this case, Dunbar's causes of action accrued in late December 1987 when she

---

3. At the time, Dunbar thought Goodman was representing her interests too.

4. The Second Agreement stated, "Dunbar hereby assigns, transfers and conveys to Zonagen ... all of her right, title and interest throughout the world in and to the [invention] to which she is entitled under the Baylor Patent Policy."

5. Dunbar hired an attorney to represent her for this transaction. Zonagen paid for this attorney.

6. The Consulting Agreement recited that Dunbar would render professional services to commercially exploit the invention, "which is concurrently being assigned to Zonagen."

7. BCM, BCMT, and Fulbright jointly filed a motion for summary judgment. Woodlands and Zonagen filed separate motions for summary judgment.

8. A two-year statute of limitations governs breach of fiduciary duty, DTPA violations, and conspiracy; a four-year statute of limitations governs fraud. *Ponder v. Brice & Mankoff*, 889 S.W.2d 637, 640 n. 1 (Tex.App.—Houston [14th Dist.] 1994, writ denied) (breach of fiduciary duty); TEX. BUS. & COMM.CODE ANN. § 17.565 (Vernon 1987) (DTPA); *Stevenson v. Koutzarov*, 795 S.W.2d 313, 318 (Tex.App.—Houston [1st Dist.] 1990, writ denied) (conspiracy); *Williams v. Khalaf*, 802 S.W.2d 651, 658 (Tex.1990) (fraud).

signed the First Agreement, Second Agreement, and Consulting Agreement. Though Dunbar did not file her original petition until May 10, 1994, a time well outside all applicable statutes of limitations, she affirmatively pleaded the discovery rule and that fraudulent concealment tolled the running of the statutes of limitations.

 The discovery rule, when applicable, tolls limitations until the claimant "knows or reasonably should know that [s]he has been legally injured by the alleged wrong, however slight. The fact that the plaintiff's actual damages may not be fully known until much later does not affect the accrual date ..." *Murphy v. Campbell,* 964 S.W.2d 265, 273 (Tex.1997); *Cornerstones Mun. Util. Dist. v. Monsanto Co.,* 889 S.W.2d 570, 576 (Tex.App.—Houston [14th Dist.] 1994, writ denied) (discovery rule imposes duty to exercise reasonable diligence to discover injury). Like the discovery rule, the fraudulent concealment doctrine tolls limitations until the fraud is discovered or could have been discovered with reasonable diligence. *Velsicol Chem. Corp. v. Winograd,* 956 S.W.2d 529, 531 (Tex.1997).

 When a defendant moves for summary judgment on the basis of limitations, it must prove the time bar as a matter of law. *Delgado v. Burns,* 656 S.W.2d 428, 429 (Tex. 1983). The defendant must prove when the cause of action accrued and that there is no genuine issue of fact about when the plaintiff discovered or should have discovered the nature of the injury. *Burns v. Thomas,* 786 S.W.2d 266, 267 (Tex.1990).

### C. Summary Judgment Evidence

The First Agreement stated that Dunbar would "hereby sell, assign, and convey unto [BCM], all right, title and interest throughout the world in and to [the invention]...." In exchange for this sale, Dunbar was to receive royalties as determined by the BCM 1987 Patent Policy. The Second Agreement stated that Dunbar "hereby assigns, trans-

fers and conveys to Zonagen ... all of her right, title and interest throughout the world in and to the [invention] to which she is entitled under the Baylor Patent Policy." BCM also transferred/assigned/sold all of its rights in the invention to Zonagen. Finally, Dunbar signed the Consulting Agreement with Zonagen that acknowledged assignment of the invention to Zonagen.

In addition, Dunbar actively participated in the drafting of the 1987 Patent Policy, which required employee inventions to be assigned to BCM. Dunbar was a member of the BCM Patent Committee from 1985 to 1994. As part of her duties as a member of the Patent Committee, Dunbar was to formulate and recommend procedures and guidelines concerning the consideration and evaluation of inventions by BCM. In December 1986, a revised Patent Policy was proposed. Dunbar was an active participant in the formulation of the proposal. In January 1987, the proposal was adopted as the 1987 Patent Policy. It stated, "Each College Personnel as a condition of employment or enrollment with [BCM] shall assign to [BCM] all Inventions, which are invented ... in exchange for the royalties and other consideration payable under this policy.... Thereafter, such Inventions shall be regarded as the proprietary, intellectual property of [BCM]...."

Finally, in Dunbar's own affidavit, she admits that a Fulbright attorney (Goodman) told her she had to sign the First Agreement because BCM "owned" the invention.[9]

Dunbar responds to this evidence by claiming she did not know the agreements would transfer all of her rights to the invention because the basis of the agreements was an August 10, 1987 Term Sheet. The Term Sheet stated Zonagen was to receive a license in the invention, not an assignment. The Term Sheet, however, was not incorporated or mentioned in the agreements.

Dunbar also asserts she had no duty to read the agreements because she had a fidu-

---

9. Her affidavit stated:

I asked Dr. Goodman why I had to sign [the First Agreement]. Dr. Goodman advised me that BCM owned my invention, and she further advised me that I was required to sign [the First Agreement]. She implicitly advised me that I was bound by BCM's patent policy and specifically advised me that [the First Agreement] was a standard form agreement.

ciary relationship with all appellees. Appellees presented evidence that Dunbar signed all three agreements, that she requested changes to the First Agreement, and that she was represented by her own attorney for the Consulting Agreement. Dunbar argues only that she had no duty to read the agreements and did not present any evidence that she did not read the agreements. We hold the summary judgment evidence established Dunbar read the agreements.

That Dunbar read the agreements is important because she also asserts she did not know, at the time the agreements were signed, the difference between "assign" and "license," and thought that the agreements only assigned her rights in the invention and that the rights would revert back to her.[10] Both the First and Second Agreements were entitled "Assignment." However, the character of these agreements does not depend solely on their titles. The First Agreement stated the assignment of rights as follows:

> Under the terms and provisions of the [1987 Patent Policy] .. I, [Dunbar], . . . do hereby sell, assign, and convey unto [BCM], all right, title and interest throughout the world in and to [the invention].

The Second Agreement stated:

> Dunbar hereby assigns, transfers and conveys to Zonagen .. all of her right, title and interest throughout the world in and to the Interest she is entitled to under the Baylor Patent Policy.

Dunbar's failure to understand the differences between a license and an assignment is undermined by the other operative language of the agreements, which plainly state that, in addition to assigning, she sold, conveyed, and transferred all of her right, title and interest in the invention throughout the world to BCM and Zonagen. Dunbar offered no summary judgment evidence that she did not know the meaning of the terms "transfer," "convey," or "sell." Thus, when she signed the agreements, she was on notice

that she no longer owned any rights in the invention.

The summary judgment evidence establishes that Dunbar knew she transferred all of her rights in the invention at the time she signed the agreements. Dunbar's claims, however, are not predicated solely on her claim that she did not know the agreements transferred all of her rights in the invention. She also alleged that representations by the Fulbright attorney, Goodman, prevented her from discovering she was not required to assign away her rights in the invention. Specifically, she stated in her summary judgment affidavit that she relied on Goodman as her attorney, and that the terms of her employment did not require her to assign the invention to BCM. As a result, Dunbar asserts, appellees' conduct (fraud, breach of fiduciary duty, DTPA violations, legal malpractice, and conspiracy) prevented her from discovering that the agreements conflicted with the terms of her employment.

Appellees presented no summary judgment evidence to establish that Dunbar was bound by any BCM patent policy. Dunbar's affidavit states she did not sign an employment agreement when she began working for BCM.

### D. Resolution

■■■ Dunbar states she thought Goodman was acting on her behalf as her attorney.[11] The attorney-client relationship is highly fiduciary in nature, and requires the utmost good faith. *Judwin Properties, Inc. v. Griggs & Harrison*, 911 S.W.2d 498, 506 (Tex.App.—Houston [1st Dist.] 1995, no writ). A fiduciary's misconduct is "inherently undiscoverable." *S.V. v. R.V.*, 933 S.W.2d 1, 8 (Tex.1996). Thus, even if Dunbar knew in 1981 that she did not have an employment agreement with BCM (and, therefore, no obligation to assign the invention to BCM), she was entitled to rely on Goodman's representation that BCM "owned" the invention and that she was required to sign the First

---

10. In terms of a patent, a license allows a person to use the patent for a limited period of time, while an assignment is the transfer of all rights to property. BLACK'S LAW DICTIONARY 109, 829 (5th ed.1979).

11. Goodman worked for Fulbright, which also represented BCM and BCMT.

Agreement. *See Jampole v. Matthews,* 857 S.W.2d 57, 64 (Tex.App.—Houston [1st Dist.] 1993, writ denied) (attorney breached fiduciary duty when he did not inform client that he was not entitled to seek increase in fees). Dunbar claims she did not discover she was not bound by any BCM Patent Policy until she received her employment file in response to discovery requests filed in this lawsuit. Thus, based on the representations of her presumed fiduciary, Goodman, a fact issue exists as to whether Dunbar knew, or reasonably could have known, that the terms of her employment with BCM did not require her to assign all of her rights in the invention.

Dunbar's petition alleged that all appellees breached a fiduciary duty owed to her. All summary judgment motions, however, asserted only that Dunbar's claims were time-barred because she knew of the facts giving rise to her claims when she signed the agreements in 1987. Dunbar presented testimony she did not know because of statements made by a fiduciary. The motions for summary judgment did not negate the existence of a fiduciary relationship. *See Jampole,* 857 S.W.2d at 60 (summary judgment cannot be affirmed on any ground not presented in the motion for summary judgment). Thus, the motions did not establish limitations as a matter of law.

We sustain appellant's sole point of error.

We reverse the decision of the trial court and remand this cause for further proceedings consistent with the opinion of this Court.

DAVIE L. WILSON, Justice.

I respectfully dissent.

It is not challenged by appellant/plaintiff Dr. Dunbar (Dunbar) that the case was filed well beyond any applicable statute of limitations to the various causes of action asserted by Dunbar, including breach of fiduciary duty. Therefore, this case turns on the proper application of the "discovery rule."

Dunbar signed the documents central to this dispute in December, 1987, and did not file her suit until May of 1994, some six and one-half years later, and after the statute of limitations had run on all of Dunbar's causes of action. When Dunbar pled her case, she affirmatively stated that the discovery rule excused her out-of-time suit.

Dunbar's case, taking everything she alleges in her petition and states in her affidavit as true as we must, rests on a single material fact. Did the Baylor College of Medicine Patent Policy apply to her when she signed the December, 1987, assignments or did it not? Dunbar claims she was ignorant of this fact and because of a representation made to her by one (and constructively all) of the appellees that it did, her causes of action are deferred until she learned that it did not after receiving her personnel file years later and after the statute had run.

Dunbar asserts that she had no duty to read the documents she signed because of the fiduciary relationships between herself and the appellees. This proposition the majority at first rebuffs by holding her responsible for understanding the import of the assignment in conveying all her interest to the appellees, but then impliedly accepts her claim of no responsibility relative to understanding the Baylor Patent Policy which is clearly referenced in the agreements.

Whether or not Dunbar signed any agreement with the Baylor College of Medicine incorporating any patent policy was a fact within her own knowledge. For the discovery rule to apply, the cause of action alleged must be "inherently undiscoverable." *S.V. v. R.V.,* 933 S.W.2d 1, 6–8 (1996). Because the fact of whether she had signed any document that caused the patent policy to apply to her was within her own knowledge, I would hold that the causes of action now asserted were not "inherently undiscoverable" within the meaning of the law. Further, because she alleges that she lost property rights she would not otherwise have lost because of the patent policy being applied to her, I would find that the causes of action were not "inherently undiscoverable" because the policy was referenced in the very documents she signed giving her ample opportunity from day one to examine and consider their relationship to her employment.

Accordingly, I would affirm the trial court's judgment.